

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2003

# Executive Bd Transp v. Transp Workers Union

Precedential or Non-Precedential: Precedential

Docket No. 02-4574

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Executive Bd Transp v. Transp Workers Union" (2003). *2003 Decisions.* Paper 310.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/310

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 30, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4574

THE EXECUTIVE BOARD OF TRANSPORT WORKERS
UNION OF PHILADELPHIA, LOCAL 234, THOMAS CASEY;
JOSEPH COCCIO; BRIAN POLLITT; KARL TURNER;
ROBERT O'CONNOR; ABE TISDALE; WILLIE BECKTON;
CHARLES CLANCY; ROBERT D'ALFONSO, and MEMBERS
OF TRANSPORT WORKERS UNION OF PHILADELPHIA,
LOCAL 234

v.

TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO;
NELLIE (JEAN) ALEXANDER, Individually and as
President of Transport Workers Union Local 234

TRANSPORT WORKERS UNION OF AMERICA,
*Appellant*

No. 03-1165

THE EXECUTIVE BOARD OF TRANSPORT WORKERS
UNION OF PHILADELPHIA, LOCAL 234; THOMAS CASEY;
JOSEPH COCCIO; BRIAN POLLITT; KARL TURNER;
ROBERT R. O'CONNOR; ABE TISDALE; WILLIE
BECKTON; CHARLES CLANCY; ROBERT D'ALFONSO, and
MEMBERS OF TRANSPORT WORKERS UNION OF
PHILADELPHIA, LOCAL 234

v.

TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO;
NELLIE (JEAN) ALEXANDER, Individually and as
President of Transport Workers Union Local 234

NELLIE (JEAN) ALEXANDER,

*Appellant*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-06633)
District Judge: Hon. Michael M. Baylson

Argued May 21, 2003

Before: SCIRICA, *Chief Judge*, SLOVITER and
NYGAARD, *Circuit Judges*

(Filed: July 30, 2003)

Joseph J. Vitale (Argued)
Cohen, Weiss & Simon
New York, NY 10036

Gail Lopez-Henriquez
William H. Haller
Freedman & Lorry
Philadelphia, PA 19106

   Attorneys for Appellant
   Transport Workers Union of
   America

Joshua P. Rubinsky
Brodie & Rubinsky
Philadelphia, PA 19107

   Attorney for Appellant
   Nellie (Jean) Alexander

Howard J. Kaufman (Argued)
Bruce Bodner
Kaufman, Coren & Ress
Philadelphia, PA 19102

Attorneys for Appellees

## OPINION OF THE COURT

SLOVITER, *Circuit Judge.*

This appeal presents us with the latest episode in an ongoing power struggle between the majority of the executive board of a union local on one side and its International and the president of the local on the other. The union is the Transport Workers Union ("TWU"); the local at issue is TWU Local 234 ("Local"); the Local's president is Jean Alexander.

The particular issue presented by this intra-union battle is whether the District Court erred in issuing a preliminary injunction against the TWU and Alexander after concluding that the TWU had interpreted its own Constitution in a patently unreasonable manner.

## I.

## BACKGROUND

A glimpse into the history of the TWU and Local 234 provides the necessary background to appreciate the issue currently before us. In 2001, the District Court for the Eastern District of Pennsylvania issued a preliminary injunction to enforce a trusteeship imposed by the TWU on the Local after a Subcommittee of the TWU's International Executive Council ("IEC") concluded that the Executive Board of Local 234 was guilty of charges leveled by the TWU against members of the Local's Executive Board. *Transp. Workers Union of Philadelphia, Local 234 v. Transp. Workers Union of Am., AFL-CIO*, 131 F. Supp. 2d 659 (E.D. Pa. 2001). The Board was found, *inter alia*, to have pressured two elected officers to resign their positions,

threatened 12 officers with removal for engaging in free speech, failed to submit timely per capita payments to the TWU, and engaged in in-fighting and factionalism to the detriment of the Local's operations. *Id.* at 662 n.6. The trusteeship ended the following year on July 19, 2002 when new officers were elected to the Board.

In the July 2002 election, the Local's membership elected 14 persons to fill all positions on the Board. Five of the persons elected — the President, the Executive Vice President, and three Board members — were from the "Alexander Slate" while the remaining nine persons elected — the three Vice Presidents, the Recording Secretary, the Secretary Treasurer and four Board members — were from the "Jeffrey Brooks Unity Team," an opposing slate. Thus, the election resulted in a Board split among two different slates, a first such situation in the history of Local 234. Previously, one of the competing electoral slates had won all seats on the Board.

Less than a week after the 2002 election, the newly elected Board convened for its first meeting with all members present and the Local's new President, Jean Alexander, presiding. The Board passed three motions appointing a professional accountant, retaining a law firm as legal counsel to the Local, and hiring five union members as full time staff. Board members voted along party lines, passing the motions by a vote of nine to five with Alexander and her slate members voting in the minority. Alexander ruled those motions out of order.

Thereafter, Alexander wrote a letter to TWU's President, Sonny Hall, challenging the constitutionality of the motions passed by the Board and requesting his interpretation, as the International President, of the scope of Alexander's powers as the President of Local 234 under the TWU Constitution. In her letter to Hall, Alexander claimed that she had "the power, to the exclusion of the Executive Board, to designate the Local's attorneys, accountants and appointed Business Agents" based on "the implied powers given to the President" by Article XVI, § 1 of the TWU Constitution. App. at 98. Alexander further relied on the "settled past practice and policy" of Local 234 by which, according to her, "the President alone designates the

attorneys, accountants and appointed Business Agents who serve the Local." App. at 99. In response, President Hall rendered an interpretation of the above constitutional provisions that upheld Alexander's position.

The nine members of the Board who originally voted in favor of the motions ("Board") filed a two count complaint in the District Court for the Eastern District of Pennsylvania against the TWU and President Alexander ("Union").[1] The complaint was accompanied by a motion for a preliminary injunction. On appeal, we are solely concerned with count one of the complaint, which asserts a claim under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, alleging that the TWU and Alexander breached the TWU Constitution by unlawfully shifting decision-making authority in Local 234 from the Board to the President. After filing the complaint, the Board, as permitted by the TWU Constitution, appealed President Hall's interpretation of the TWU Constitution to the IEC. The IEC affirmed Hall's interpretation but clarified that the Board could review and disapprove certain decisions made by the Local President according to a "reasonableness" standard. App. at 102. The parties had agreed to withhold action on the motion for a preliminary injunction pending the result of the internal union appeal. Once the IEC rendered its decision, the Board filed a renewed motion.

The District Court granted the Board's motion for a preliminary injunction, enjoining the TWU from giving force or effect to President Hall's interpretation of presidential powers; ordered the TWU and Alexander to give full force and effect to the motions passed at the Board's July 25, 2002 meeting; and enjoined Alexander from filing disciplinary charges against members of the Board because of the motions passed at the July 25, 2002 meeting. *Executive Bd. of Transp. Workers Union of Philadelphia, Local 234 v. Transp. Workers Union of Am., AFL-CIO*, 236 F. Supp. 2d 480 (E.D. Pa. 2002). In so doing, the District Court acknowledged the substantial deference afforded to

---

1. We denominate Appellants as the "Union" because they are the parties representing the view of the parent, the TWU, and the Appellees as the "Board" because they represent the majority of the Local's Board.

union officials in interpreting a union's Constitution. *Id.* at 487. It correctly noted that a party bringing a § 301 LMRA claim bears the burden of demonstrating to the court that the union's interpretation of its own governing documents was "patently unreasonable." *Id.* Bearing this deference in mind, the District Court nonetheless concluded that "giving deference to [the Union's] interpretation would condone verbal violence against the plain meaning of the union's Constitution." *Id.* at 493-94. The Union timely appealed.

## II.

## DISCUSSION

### A. Jurisdiction and Standard of Review

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1). The District Court's determination in granting the preliminary injunction will be reversed only if it abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof. *Loretangeli v. Critelli*, 853 F.2d 186, 193 (3d Cir. 1988). Although the scope of our review is limited, " 'any determination that is a prerequisite to the issuance of an injunction . . . is reviewed according to the standard applicable to that particular determination.' " *Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148, 150-51 (3d Cir. 2001) (citation omitted). Thus, we exercise plenary review over the District Court's conclusions of law and its application of the law to the facts. *Id.* at 151.

In issuing the preliminary injunction, a district court must consider the following:

> (a) did the movant [here the Board] make a strong showing that it is likely to prevail on the merits? (b) did the movant show that, without such relief, it would be irreparably injured? (c) would the grant or denial of a preliminary injunction substantially have harmed other parties interested in, or affected by, the proceedings? (d) where lies the public interest?

*Loretangeli*, 853 F.2d at 193 (citation omitted). The District Court considered all four factors, concluding that they pointed towards injunctive relief for the Board. *Executive Bd.*, 236 F. Supp. 2d at 494-97. Before us, the Union focuses on the first factor, namely whether the Board made a strong showing that it is likely to prevail on the merits.

Central to this appeal is the deference that courts accord to a union's interpretation of its own Constitution. With common ground eluding the parties as to most issues, they nonetheless agree that courts typically defer to a union's interpretation of its own Constitution and will not override that interpretation unless it is "patently unreasonable." Although this court has never explicitly defined "patently unreasonable," the standard is undeniably a high one as " '[c]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable.' " *Local 334, United Ass'n of Journeymen v. United Ass'n of Journeymen*, 669 F.2d 129, 131 (3d Cir. 1982) (citation omitted); *see also Stelling v. Int'l Bhd. of Elec. Workers*, 587 F.2d 1379, 1389 n.10 (9th Cir. 1978) ("The proper inquiry has been described as 'whether there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight.' ") (citation omitted). Furthermore, we have noted that an interpretation that conflicts with the "stark and unambiguous" language of the Constitution or reads out of the Constitution important provisions is a "patently unreasonable interpretation" of a union Constitution. *Loretangeli*, 853 F.2d at 194-95. Bearing the considerable deference that we, as a court, owe to TWU's interpretation of its own Constitution, we turn now to the parties' conflicting constitutional interpretations.

## B.  The TWU Constitution

### 1.  The Union's Challenge

Article XVI, § 1 of the TWU Constitution, "Duties of Local Officers," which is at the heart of this appeal, reads as follows:

> The President shall preside at all meetings of the Local Union, the Local Executive Board and Joint Executive Committee. He/she shall sign all orders on [sic] the Financial Secretary-Treasurer authorized by the Local Executive Board and shall countersign all checks issued by the Financial Secretary-Treasurer against the accounts of the Local Union on authorization of the Local Executive Board. He/she shall enforce the provisions of this Constitution. He/she shall appoint all committees not otherwise provided for. He/she shall perform such other duties as the Local Union, or the Local Executive Board may assign to him/her; and **except as to powers and duties specifically conferred on him/her by the Constitution**, **he/she shall adhere to all decisions and directions of, and be subject to, the Local Executive Board.** He/she shall be, ex officio, a delegate to Convention of the International Union and of all organizations to which the Local is affiliated. **He/she shall be responsible for the proper conduct of the affairs of the Local Union**, and the compliance by his/her fellow officers with their obligations under the International Constitution and the Local by-laws. He/she shall be chairman of the Local's Committee on Political Education.

TWU Const. art. XVI, § 1 (emphasis added).

In granting the preliminary injunction, the District Court held that the Board was likely to prevail on the merits of its claim and that the interpretation of President Alexander and the TWU was patently unreasonable. *Executive Bd.*, 236 F. Supp. 2d at 494-96. Although the District Court considered the interpretations of Local President Alexander, TWU President Hall, and the IEC, it referred to the latter two interpretations as "articulations and not the actual decision." *Id.* at 494. According to the District Court, it "interprets the sequence of events as the IEC affirming President Hall, who affirmed the power of Local President Alexander to have the rights which Local President Alexander claimed in her letter of July 25, 2002." *Id.*

This is an accurate sequence of events. It is important to understand whose interpretation represents the interpretation of the Union because, although there is

essential agreement between President Alexander, President Hall and the IEC, there are differences in their interpretations. The TWU Constitution explicitly gives the International President, here Sonny Hall, the power to "interpret the meaning and application of the provisions" of the Constitution. TWU Const. art. V, § 1. The same constitutional provision thereafter provides that "[a]ny such interpretation or application may be appealed by any member or by any Local Union adversely affected to the [IEC]." TWU Const. art. V, § 1.

The Board followed the internal appeal provided by the Constitution, appealing President Hall's interpretation to the IEC. Because the IEC served as the final step in the internal union appeals process, we consider its interpretation of the Constitution to be that of the Union and thus we review it — over and above the interpretations rendered by Hall and Alexander — under the patently unreasonable standard. However, the IEC interpretation must be understood in context.

In response to President Alexander's constitutional inquiry, Hall rendered the following interpretation in his July 26, 2002 letter to Alexander:

> Article XVI, Section 1, places on the Local President the responsibility "for the proper conduct of the affairs of the Local Union." It is inconceivable to me that a Local President could even begin to carry out this responsibility without the power to select staff and professionals whom the President felt he/she could trust to provide the necessary assistance in a reliable manner. The responsibility for "the proper conduct of the affairs of the Local Union" is thus inextricably bound up with the power to hire and fire staff professionals. The Executive Board of Local cannot usurp the power in question without invading a responsibility specifically assigned by the Constitution to the Local President. Any attempt by an Executive Board, on its own and contrary to the wishes to [sic] the President, to exercise the power to hire and fire thus violates the T.W.U. Constitution.

> This interpretation of the Constitution is consistent with the past practice at T.W.U. Locals.

App. at 100.

The IEC, in turn, affirmed President Hall's interpretation with the caveat that although the Local President had the power to hire and fire staff and retain professional help, the Board retained the power to reject particular decisions provided that its justification is deemed to be "reasonable." App. at 102. The IEC rendered its decision in a letter to the Local's Recording Secretary, Thomas R. Casey, dated October 30, 2002. Although the crux of this rather lengthy letter is the IEC's affirmation with the "reasonableness" qualification, its relevant passages are the following:

> Prior to consideration of the matter by the entire [IEC], President Hall told the [IEC] that his interpretation should not be taken to stand for more than what it explicitly stated, namely, that the decisions to hire and fire staff, and to retain outside professional help, must originate with the President, and that the Executive Board had no right to usurp this Presidential authority by initiating decisions on who to hire and who to retain without reference to the decisions made by the President. He said that this interpretation should not be taken to mean that the Executive Board had no role whatever in reviewing these kinds of decisions by the President, or that in appropriate cases the Executive Board could not be justified in voting to disapprove, for instance, a particular arrangement reached between the President and an outside lawyer or accountant, provided its justification for the rejection was reasonable.
>
> . . . .
>
> . . . [A] motion was made to affirm the Constitutional interpretation made by President Hall in his letter of July 26. . . . The motion was passed.

App. at 102.

Thus, the narrow question before us on appeal is whether the IEC's constitutional interpretation — with its reasonableness standard — is patently unreasonable. Of course, we recognize that underlying this narrow legal question is the broader power struggle pervading the

current appeal. As counsel for the Board rhetorically asked: "The whole issue here is who ultimately makes the decisions? Who ultimately has the power and authority?" Tr. of Oral Argument, May 21, 2003, at 38.

### 2. Constitutional Provisions

There are two somewhat conflicting provisions in Article XVI, § 1 that give rise to the battling constitutional interpretations before us. The first provision, appropriately referred to as the "adherence clause" by the parties, reads as follows: "except as to powers and duties specifically conferred on him/her by the Constitution, [the President] shall adhere to all decisions and directions of, and be subject to, the Local Executive Board." TWU Const. art. XVI, § 1. The Board relies on this provision. The Union, for its part, relies on the so-called "responsibility clause" that states: "[the President] shall be responsible for the proper conduct of the affairs of the Local Union. . . ." TWU Const. art. XVI, § 1.

The District Court found no ambiguity in the words of the Constitution but instead concluded that the "intent and plain meaning" of the Constitution is to "give overriding authority and control to the [Board]." *Executive Bd.*, 236 F. Supp. 2d at 494. In so concluding, the District Court stated that "[t]he plain language of the Constitution mandates that the Local President '*shall adhere to all decisions and directions of, and be subject to, the Local Executive Board.*' " *Id.* (alteration in original). According to the District Court, "[t]his clear, unambiguous language does not in any way lend itself to President Hall's interpretation. . . ." *Id.* Furthermore, the District Court rejected the reasonableness standard proffered by the IEC, noting that it could find no basis for such a standard in the TWU Constitution. *Id.* at 495.

In attacking the District Court's opinion, the Union primarily calls on the considerable judicial deference that is to be afforded to its constitutional interpretation. It further argues that there is "no dispute" that the Constitution fails to expressly give either the Local President or Board absolute power to retain counsel, hire accountants, or employ staff for the Local and argues that, in light of this

ambiguity, it is not patently unreasonable to conclude that the initial decision in these areas must originate with the Local President which the Board may review and even reject, as long as its rejection is reasonable. The Union takes the position that ultimately the IEC would be the body that would determine whether the Board's rejection was reasonable.

The Union faults the District Court for selectively quoting from the TWU Constitution, considering only the adherence clause to the exclusion of the responsibility clause. It argues that if the District Court had properly considered all rather than only certain constitutional passages, it could not have concluded that the Union's interpretation "would condone verbal violence against the plain meaning of the union's Constitution." *Executive Bd.*, 236 F. Supp. 2d at 493-94. The Union argues that in concluding that the Constitution unambiguously empowers the Board to make such decisions, the District Court severed the qualifying portion of the adherence clause, which states: "except as to the powers and duties specifically conferred on [the President] by the Constitution. . . ." TWU Const. art. XVI, § 1. It notes that altogether missing from the District Court's analysis is any reference to the responsibility clause which states that "[the President] shall be responsible for the proper conduct of the affairs of the Local union." TWU Const. art. XVI, § 1. According to the Union, if the District Court had taken into account these two provisions, it could not have concluded that the Constitution empowers the Board to make unilateral decisions regarding staff and professionals.

Predictably, the Board argues just the opposite, urging us to affirm the District Court. Acknowledging that courts typically defer to a union's interpretation of its own Constitution — here the IEC's interpretation — the Board argues that in this instance, the Union's interpretation is patently unreasonable as it conflicts with the clear and unambiguous language in the Constitution, ignores the plain terms of the Constitution, and reads important provisions out of the Constitution.[2] It further notes that the

2. We note that the Board refers to President Hall's interpretation as the one at issue but, as explained above, we consider the interpretation of the IEC to be the Union's interpretation.

TWU interpretations — of both Hall and the IEC — fail to mention the adherence clause. As for the responsibility clause, the Board argues that the District Court did, in fact, consider it, as evidenced by the Court's statement that "[t]he Local President is authorized to act similarly to most executives, that is, to carry out the decisions of a Board of Directors, or, in this case, the Local Executive Board." *Executive Bd.*, 236 F. Supp. 2d at 494. Unquestionably, this is a skewed reading of the District Court's opinion as nowhere in the Court's analysis can we find reference to the responsibility clause. The crux of the parties' contentions is that each claims that the other has read out an important constitutional provision.

## C. Disposition

This court has previously rejected an approach by which only certain provisions of a union's Constitution are considered. We noted that when a union's interpretation of its Constitution reads out an "important protective provision," it may be found to be patently unreasonable. *Loretangeli*, 853 F.2d at 195. In *Loretangeli*, Plaintiffs, who were members of Local 194 of the New Jersey Turnpike Employees' Union, challenged the payment of rebates of per capita dues to two other union locals made by the parent organization, the Federation. *Id.* at 187. The district court dismissed Plaintiffs' complaint and denied their motion for a preliminary injunction, finding the Federation's action to be authorized by its reasonable interpretation of the union's Constitution. *Id.*

On appeal, we concluded that the district court had misconstrued the proof presented and erred as a matter of law because the Federation's interpretation conflicted with the stark and unambiguous language of the Constitution which barred rebates to any local union not accorded to all of the other locals. *Id.* at 194. Because the Federation's interpretation read out of the Constitution an important provision, *id.* at 195, we reversed the dismissal of the complaint and remanded for further consideration of the Plaintiffs' application for a preliminary injunction. *Id.*

This case is different. First, there is no stark and unambiguous language clearly supporting either party's

contentions. If there were, resolution would be much easier. Second, both parties read out provisions from the Constitution, thereby precluding either of them from effectively relying on *Loretangeli* for doctrinal support. It is true, as the Board claims, that neither President Hall nor the IEC refers to the adherence clause, focusing instead on the responsibility clause in rendering their interpretations. It is also true, as the Union notes, that the District Court and the Board have ignored the responsibility clause. So, both sides are correct in their contentions that the other has failed to account for all of the provisions of the Constitution.

The difficulty is that a reading of all of the applicable provisions shows that there is no unambiguous grant of power to either party. Consequently, we are constrained to accept the Union's interpretation, not because it is compelled by the language but only because of the considerable deference we owe to it. In so concluding, we do not suggest that the IEC's interpretation is better than the Board's, but we merely hold that it is not patently unreasonable.[3] Furthermore, the Board's reference to Article XII, § 2 does nothing to help its cause. Contrary to the Board's contentions, nothing in that section explicitly bestows the Board with the exclusive power to originate hiring decisions.[4]

---

3. The Board also argues that the "reasonableness" component of the IEC's interpretation is, in and of itself, invalid as it cannot be found in the text of the Constitution. It nonetheless concedes that the IEC has the authority to interpret the Constitution. The Board's positions are in tension. If the IEC has the power to interpret the Constitution, it also has the power to apply a reasonableness standard with which the Board must comply in reviewing President Alexander's selections. As the IEC is empowered to "interpret" and not simply "read" the Constitution, its interpretation supplemented by a reasonableness standard, is not patently unreasonable.

4. That section reads:

Subject to the provisions of the International Constitution and the by-laws of the Local Union and to all delegations of authority and assignment of responsibility to the Local Officers and to the Local Executive Board as provided in the International Constitution and Local by-laws, the supreme authority in the Local Union shall be the

On a final note, the Union buttresses its position by arguing that its interpretation is consistent with past practices of the Local. Specifically, it argues that historically Local Presidents have exercised the power to originate employment decisions. While it is true that we may consider past practices of the Union, *see Loretangeli*, 853 F.2d at 195, because the Local had heretofore never elected a split board, we will refrain from making the apples to oranges comparison urged by the Union.

## III.

## CONCLUSION

While the unfortunate political animosity pervading this intra-union battle is deep, the legal issue before us is narrow, namely whether the Union's interpretation of the TWU Constitution is patently unreasonable to warrant the preliminary injunction issued by the District Court. Given the deference we afford to unions in interpreting their own Constitutions, we conclude that although not compelled by the language, the Union's constitutional interpretation is not patently unreasonable. Thus, we will remand to the District Court with instructions to dissolve the preliminary injunction.[5] The mandate shall issue forthwith.

---

membership of the Local Union, acting through duly called regular meetings of the Local Union or through duly called regular meetings of the respective sections or divisions of the Local meeting separately, as the Local by-laws may provide. Between such meetings, the Local Executive Board shall have the power and authority to administer the affairs of the Local Union.

TWU Const. art. XII, § 2.

5. The Union argues that the District Court's attention to the fundamental inquiry before it was "diverted" by the Court's reliance on democratic policy considerations. Br. of Union at 19. Although we agree with the District Court as to the emphasis that labor policy places on the need for union democracy, that does not help resolve the issue in this case as all of the contending parties were elected by the membership.

16

A True Copy:
       Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*